In re the GENERAL ADJUDICATION OF ALL RIGHTS TO USE WATER IN THE BIG HORN RIVER SYSTEM and All Other Sources, State of Wyoming.

State of Wyoming; Midvale Irrigation District; G.A. Brown Testamentary Trust through Langford Keith, Co-Trustee; LeClair Irrigation District; Riverton Valley Irrigation District; and James R. Allen, et al., Appellants (Plaintiffs).

Nos. 91-83, 91-84, 91-91 to 91-94, 91-96 and 91-97.

Supreme Court of Wyoming.

June 5, 1992.

Joseph B. Meyer, Atty. Gen., Mary B. Guthrie, Senior Asst. Atty. Gen., and Michael D. White, David F. Jankowski, and Thomas J. Davidson, Special Asst. Attys. Gen., of White & Jankowski, Denver, Colo., for the State.

Jay E. Vincent of Vincent & Vincent, Riverton, and Richard A. Simms and Jay F. Stein and James C. Brockmann, of Simms & Stein, P.A., Santa Fe, N.M., for Midvale Irrigation Dist.

Michael S. Messenger of Messenger & Jurovich, Thermopolis, for G.A. Brown Testamentary Trust.

Norman E. Young of Hill, Young & Barton, P.C., Riverton, for LeClair Irrigation Dist.

Donald P. White of White, White & Roberts, P.C., Riverton, for Riverton Valley Irrigation Dist.

Sky D. Phifer of Phifer Law Office, Lander, for James R. Allen, et al.

Richard B. Stewart, Asst. Atty. Gen., and Judith Rabinowitz and James J. Clear, Attorneys, Dept. of Justice, Environment and Natural Resources Div., Washington, D.C., for the U.S.

William J. Thomson, III of Dray, Madison & Thomson, Cheyenne, and Susan M. Williams and Jane Marx of Gover, Stetson & Williams, P.C., Albuquerque, N.M., for Shoshone Indian Tribe.

Andrew Baldwin and Robert F. Thompson, Ethete, for Northern Arapaho Tribe.

Don W. Riske of Riske & Arnold, Cheyenne, and Thomas D. Lustig of the National Wildlife Federation, Boulder, Colo., for amicus curiae Wyoming Wildlife Federation and National Wildlife Federation.

Before THOMAS, CARDINE, MACY and GOLDEN, JJ., and BROWN, J. (Retired).

MACY, Justice.

The State of Wyoming and non-Indian water users appeal from a judgment entered by the district court which (1) decreed that the Shoshone and Northern Arapaho Tribes on the Wind River Indian Reservation may change the use of their reserved water right as they deem advisable without regard to Wyoming water law; and (2) substituted the tribal water agency for the state engineer as the administrator of both reserved and state-permitted water rights within the Wind River Indian Reservation.

We reverse.

The core issues stated in various ways by the several appellants are:

1. Whether the Tribes may change their right to divert future project water for agricultural purposes to a right to maintain an instream flow for fishery purposes without regard to Wyoming water law; and

2. Whether the Tribes have the right to administer all the water rights within the reservation to the exclusion of the Wyoming state engineer.

This is another appeal of an ongoing general adjudication of all water rights in the Big Horn River System, involving over 20,000 claimants. Because of its size and complexity, the adjudication is being conducted in phases. The dispute presently before this court relates to the interpretation of the amended judgment and decree entered on May 24, 1985, by Judge Alan B. Johnson (the 1985 decree) involving Phase I, wherein the Tribes were granted the right to divert water for agricultural purposes on reservation land historically irrigated, as well as on reservation land included within certain future projects. In *Big Horn I*,[1] this court affirmed the 1985 decree, granting the Tribes the right to divert water from the Big Horn River System for agricultural purposes and subsuming livestock, municipal, domestic, and commercial uses within those purposes. This court also affirmed the district court's finding that an instream flow right for fisheries was not a subsuming use. The United States Supreme Court affirmed the *Big Horn I* decision in 1989.[2] After the United States Supreme Court affirmed the Wyoming Supreme Court's decision, the Tribes announced their intent to dedicate a portion of their reserved water right, which had been awarded for future projects, to instream flow for fisheries and other nonsubsumed uses in the Wind River. To that end, the Tribes adopted a Wind River Interim Water Code, created the Wind River Water Resources Control Board, and, on April 12, 1990, granted themselves Instream Flow Permit No. 90–001, which au-

---

1. *State v. Owl Creek Irrigation District Members (General Adjudication of All Rights to Use Water in the Big Horn River System)*, 753 P.2d 76 (Wyo.1988), *cert. granted in part*, 488 U.S. 1040, 109 S.Ct. 863, 102 L.Ed.2d 987 *cert. denied in part*, 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989).

2. *Wyoming v. United States*, 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342 (1989).

thorized the dedication for the 1990 irrigation season of up to 252 cfs of water in the Wind River for "fisheries restoration and enhancement, recreational uses, ground water recharge downstream benefits to irrigators and other water users."

Shortly after the issuance of Permit No. 90–001, the Tribes complained to the state engineer that the diversion of water by holders of state-awarded water rights caused the Wind River flows to be less than that amount authorized by the permit. The state engineer informed the Tribes that their permit was unenforceable because the Tribes had been awarded only the right to divert water and that any change in the use of future project water covered by their reserved water right must be made following a diversion. The Tribes nevertheless thereafter requested that the state-awarded water rights of Midvale Irrigation District be curtailed so that the instream flows could be maintained. The state engineer refused to honor this request, which he viewed as being an unlawful selective call.

On July 30, 1990, the Tribes filed a motion in the district court for an order to show cause why the state engineer should not be held in contempt, why he should not be relieved of his duties, and why a special master should not be appointed to enforce the Tribes' reserved water right. The State filed its own motion for a determination of certain administrative matters. The district court referred the motions to a special master for a report. The special master agreed to hear all the issues raised except for the contempt issue involving the state engineer.

The specific issues which the Tribes presented to the special master were: (1) Whether the Tribes were permitted to convert their water right reserved for future agricultural projects to an instream flow; (2) whether the Tribes properly accomplished the allocation of future project water to instream flow use pursuant to the Wind River Interim Water Code and Permit No. 90–001; and (3) whether the state engineer had an obligation to enforce the tribal instream flow permit. A partial list of the State's issues presented to the special master included: (1) Whether the state engineer had the authority to administer the Tribes' reserved water right; (2) whether, if the Tribes' future project water may be changed to instream uses, the change must be made in accordance with Wyoming water law; and (3) whether a change in use of future project water may be made without consideration of injury to junior appropriators.

After hearing oral arguments on exceptions to the special master's report, the district court entered its judgment and decree on March 11, 1991, declaring that the Tribes were entitled to use their reserved water right on the reservation as they deemed advisable, including instream flow use, without regard to Wyoming water law. The district court did not distinguish that portion of the Tribes' reserved water right quantified on the basis of historical use from that portion quantified on the basis of future practicably irrigable acres when it issued its judgment and decree. The only issue properly before the district court was whether the Tribes could dedicate their future project water to instream flow for the purposes of maintaining fisheries, et cetera, without regard to Wyoming water law. We limit the scope of review on appeal accordingly. The court also ordered the substitution of the Tribes for the state engineer as the administrator of Indian and non-Indian water rights within the Wind River Indian Reservation. On May 3, 1991, this court stayed the judgment and decree from which this appeal is taken.

■ The Tribes interpret the findings of fact, conclusions of law, and judgment entered on May 10, 1983, by Judge Harold Joffe (the 1983 decision), approving the master's report which awarded them a reserved water right to irrigate practicably irrigable acres within the Wind River Indian Reservation, as not restricting the Tribes' use of their future project water so long as consumptive use was not increased and the use was confined to the reservation. The Tribes contend that the agricultural purposes relied upon to quantify their water right do not limit their uses of

the water. They reason that Judge Joffe made it clear in his 1983 decision that the methodology used to quantify the Tribes' reserved water right, whether by historical use or by practicably irrigable acreage, in no way limited their use of the water by stating:

> This Court, thus, calculates the Tribes['] entitlement to a reserved water right, with a priority date of 1868, based on the purpose of agriculture (which term includes livestock use and domestic use) and denies such reserved water right for other multi-purpose uses as claimed by the Tribes. The Court by such finding does not intend to dictate to the Tribes that they are restricted as to the use of said reserved water only for the purpose of agriculture, inasmuch as it recognizes that it cannot tell the Tribes how they must use water that comes under a reserved water permit. If the Tribes desire to use so much of their water for other purposes, they may do so.

1983 decision at 20.

> The Court states again the premise that the determination of "historic" acreage and "practicably irrigable acreage" is used only as a measuring device to calculate the Tribes['] present and future needs.... When the Tribes determine where and how they wish to use the water granted in this decree, they will inform the proper authorities who will then be able to make the specific determinations which are necessary for administration of a water right.

1983 decision at 36.

> 8. The Tribes are entitled to make such use of the water covered by their reserved water rights [as] they deem advisable but the use is confined to the reservation and in no event shall the consumptive use be increased.

1983 decision at 70. The Tribes also support their reasoning by pointing out that the order ruling on motions to alter or amend the 1983 decision entered on June 8, 1984, by Judge Johnson, denying the Tribes' motion for an additional quantity of reserved water for instream flow, stated:

The reserved water right quantified by Judge Joffe does not deny the Tribes the ability to regulate in-stream flows in order to maintain what may be considered necessary water for optimum fish habitat, nor does the opinion limit any such power that may exist on the part of the Tribes. The Tribes may seek to dedicate their stream flows for fish habitat by using water reserved to them by the decision.

The State counters by declaring that the Tribes' reliance upon the 1983 decision as being authority to permit them to use their future project water to maintain instream flows is remarkably misplaced. The State contends that the 1985 decree, which amended the 1983 decision, contained no possibility that the Tribes' reserved water right was other than to actually divert water from the stream. The State buttresses this contention by reasoning that Judge Johnson discarded his previous views on instream flows when he entered his 1985 decree or he would have provided for such and that the Tribes were not awarded water rights which might or could have been included in the 1985 decree.

The parties' reliances upon the 1983 decision or upon the 1985 decree to support their contentions are not justified. The issue of whether or not the Tribes have unlimited discretionary use of their quantified reserved water right was decided in *Big Horn I.* We qualified the Tribes' use of their water right by stating:

> The government may reserve water from appropriation *under state law for use on the lands set aside* for an Indian reservation....
>
> ....
>
> ... Considering the well-established principles of treaty interpretation, the treaty itself, the ample evidence and testimony addressed, and the findings of the district court, we have no difficulty affirming the finding that it was the intent at the time to create a reservation with a sole agricultural purpose....
>
> ....

... The evidence is not sufficient to imply a fishery flow right absent a treaty provision.

*Big Horn I,* 753 P.2d at 94–98 (emphasis added).

Our opinion clearly and unequivocally stated that the Tribes had the right to use a quantified amount of water on their reservation solely for agricultural and subsumed purposes and not for instream purposes. If we had intended to specify what the water could be used for merely as a methodology to determine the amount of water the Tribes could use for any purpose, we would have said so. The contrary is unmistakable. *See* the dissenting opinions of Justice Thomas and Judge Hanscum in *Big Horn I,* wherein they stated that they would have allowed the Tribes to use the water for any purpose appropriate to the progress and development of the reservation rather than limiting the uses to those mentioned in the majority opinion. It is not necessary for us to discuss the Tribes' alternative contention that principles of federal law do not limit the uses to which they may put their water or the State's contention that the 1983 decision and the 1985 decree are not final orders. *Big Horn I,* having been affirmed by the United States Supreme Court, is final and controlling. The Tribes do not have the unfettered right to use their quantified amount of future project water for any purpose they desire.

■ We must now consider whether the district court erred when it decreed that the Tribes may change the use of their reserved future project water right from agriculture to any other purpose, including instream flows, without regard to Wyoming water law. The Tribes' first contention is that judgment and decree no. 8 in the 1983 decision gave them the right to change the "use of the water covered by their reserved water rights" in any manner in which they deemed advisable. This position is simply not tenable. Our decision in *Big Horn I* is controlling. As we previously stated, the Tribes' reliance upon the 1983 decision for this proposition is not justified. It makes no sense whatsoever for this court to limit the use of the water for agricultural purposes and then to permit the Tribes to unilaterally change that use.

The Tribes also contend that this court held that federal and not state law applied when we stated in *Big Horn I,* "The decree entered in the instant case does not require application of state water law to the Indian reservation." 753 P.2d at 115. We do not disagree with this statement; however, the statement cannot be taken out of context. We made this statement in acknowledgment that the Tribes had a reserved right by treaty to the use of Wyoming water for agricultural purposes which was not dependent upon state law or procedures and which did not need to be adjudicated pursuant to our statutory scheme. We clearly stated, "Federal law has not preempted state oversight of reserved water rights." *Id.* at 114.

The Tribes further contend that an unbroken chain of decisions exists in the United States determining that the Tribes' water rights are governed by federal law. The Tribes, however, fail to direct us to any of these decisions. The Tribes' additional reasoning that historical federal and tribal regulation of Indian water use is strong evidence that state control is federally preempted is not persuasive. We are persuaded by *United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978), wherein the United States Supreme Court held that water is impliedly reserved only to the extent necessary to meet the primary purpose(s) for which a reservation is made and that, where water is valuable for a secondary purpose, the inference arises that Congress intended for water to be acquired in the same manner as is employed by any other private or public appropriator. In *United States v. Adair,* 723 F.2d 1394 (9th Cir.1983), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984), the United States attempted to convert Indian reserved water rights to forest and wildlife programs. The Ninth Circuit Court of Appeals rejected the attempt and stated:

The purpose of a federal reservation of land defines the scope and nature of impliedly reserved water rights. Because

the reserved rights doctrine is an exception to Congress's explicit deference to state water law in other areas, the Supreme Court has emphasized the importance of the limitation of such rights to only so much water as is essential to accomplish the purpose for which the land was reserved. We conclude that it would be inconsistent with the principles expressed in *United States v. New Mexico* to hold that the Government may "tack" a currently claimed *Winters* right to a prior one by asserting that it has merely changed the purpose of its previously reserved water right.

723 F.2d at 1419 (citations omitted). We see no reason why this rationale should not apply to a change of use of the future project water acquired by the Tribes solely for agricultural purposes. We hold that the Tribes, like any other appropriator, must comply with Wyoming water law to change the use of their reserved future project water from agricultural purposes to any other beneficial use. We leave for another day the question of whether the Tribes may dedicate their historically used water to instream flow, as that issue is not directly presented for our review by the facts of this case.

■ The State contends that, even if the Tribes were to petition for a change of use, our statutory and case law would not permit them to change the use of their water right for instream flow purposes. The State reasons that the Tribes have been awarded only the right to make an actual physical diversion of water and that any change would be limited to a beneficial use which can be made of the water after such diversion is made. The district court stated unequivocally that the term "divert" was used generally to describe water use and was never used as a word of limitation.

Although our statutory scheme regulating the appropriation of water has contemplated an actual physical diversion of wa-

ter, we have never said that a requirement to do so existed. This is understandable if we give consideration to the fact that, until passage of our instream flows act,[3] it was necessary to actually divert water to put it to a beneficial use permitted by law in Wyoming. "Beneficial use" is, however, an evolving concept and can be expanded to reflect changes in society's recognition of the value of new uses of our resources.[4] Actual diversion is neither constitutionally required nor an essential element of our appropriation doctrine. Beneficial use is the key element. Wyo.Stat. § 41–3–101 (Supp.1991) provides in relevant part: "Beneficial use shall be the basis, the measure and limit of the right to use water." We join the Idaho Supreme Court[5] and hold that an actual diversion of water is not necessary to appropriate water for a beneficial use. This holding, however, is of no comfort to the Tribes or to the national and Wyoming wildlife federations which have filed an *amicus curiae* brief, as the appropriation of water for instream flow is not a beneficial use which is presently available to the Tribes. Wyo.Stat. § 41–3–1002(e) (Supp.1991) clearly provides: "No person other than the state of Wyoming shall own any instream flow water right."

The Wyoming legislature has for good reason precluded water right holders from unilaterally dedicating water to maintain instream flows. Water is the lifeblood of Wyoming. It is a scarce resource which must be effectively managed and efficiently used to meet the various demands of society. Wyoming's founding fathers also recognized the necessity of having state control over this vital resource. The convention journals reflect that a preliminary draft of Article 8, § 1 of the Wyoming Constitution provided for state ownership of all waters "not heretofore appropriated." Mr. Brown, a prominent member of the convention, objected by stating:

---

3. Wyo.Stat. §§ 41–3–1001 to –1014 (Supp.1991).

4. Rick A. Thompson, Comment, *Statutory Recognition of Instream Flow Preservation: A Proposed Solution for Wyoming*, 17 LAND & WATER L.REV. 139, 143 (1982).

5. *State Department of Parks v. Idaho Department of Water Administration*, 96 Idaho 440, 530 P.2d 924 (1974).

As this bill reads as originally presented, it leaves the people who have appropriated a portion of the water as the absolute owners of it, and the state will declare that they have no ownership whatever to any of the waters that have been heretofore appropriated. If they so declare, it would be utterly impossible for the legislature, or any power of the state, to control, regulate, or in any manner interfere with its use. It is only by the declaration that we are to be the absolute owners of all the water that we may be enabled to control unreservedly the uses to which it may be put.

JOURNALS AND DEBATES OF THE CONSTITUTIONAL CONVENTION, STATE OF WYOMING 289 (1889). Article 8, § 1 of the Wyoming Constitution was amended accordingly.[6] Our decision today recognizes only that which has been the traditional wisdom relating to Wyoming water: Water is simply too precious to the well being of society to permit water right holders unfettered control over its use.[7]

We turn now to the State's contentions regarding that portion of the district court's March 11, 1991, judgment and decree which provided:

The Tribal agency which regulates reserved water matters shall have the authority to administer all water rights within the stipulated boundaries of the reservation. Non–Indian rights will be administered according to state water law by the Tribal agency, with appropriate judicial review in state district court pursuant to Title 41 of the Wyoming statutes.

The State argues, among other things, that the district court violated the Wyoming Constitution by removing the state engineer from being the administrator of state water within the reservation. The Tribes counter by contending that the constitutional issue should not be entertained on appeal as it was not raised before the trial court.

■ Regarding the Tribes' contention, we have often stated that this court will not consider issues for the first time on appeal which have been neither raised in nor argued to the trial court, unless they go to jurisdiction or are otherwise of such a fundamental nature that we must take cognizance of them. *E.g., Oatts v. Jorgenson,* 821 P.2d 108 (Wyo.1991). We have previously recognized, however, that constitutional issues regarding possible violations of the separation of powers doctrine can be of such a fundamental nature as to require consideration and resolution by this court for the first time on appeal. *White v. Fisher,* 689 P.2d 102 (Wyo.1984); *but see Nickelson v. People,* 607 P.2d 904 (Wyo. 1980). In the instant case, the State raises the issue of whether the district court's removal and replacement of the state engineer constituted an unlawful infringement by the judiciary on the rights, powers, and privileges reserved to the executive branch of government by the Wyoming Constitution. We believe that, in light of the ongoing nature of this case and of the need for certainty in future proceedings, it is necessary that we address the State's constitutional issue at this juncture to further define the respective roles of the various branches of state government as they relate to this dispute.

**6.** Article 8, § 1 of the Wyoming Constitution reads:

The water of all natural streams, springs, lakes or other collections of still water, within the boundaries of the state, are hereby declared to be the property of the state.

**7.** Even if the Tribes were to petition to change the use of their reserved water right from agricultural purposes to another beneficial use *permitted by law,* they would have to overcome the difficulty of complying with Wyo.Stat. § 41–3–104 (1977). Section 41–3–104 provides that changes in the use or place of use of water may be allowed if the water transferred does not (1)

exceed the amount of water historically diverted under an existing use; (2) exceed the historic rate of diversion under an existing use; (3) increase the historic amount consumptively used under an existing use; (4) decrease the historic amount of return flow under an existing use; or (5) injure in any manner other lawful appropriators. *See also Green River Development Company v. FMC Corporation,* 660 P.2d 339 (Wyo.1983), and *Basin Electric Power Cooperative v. State Board of Control,* 578 P.2d 557 (Wyo.1978) (only transferable interest in water is that which has been put to beneficial use).

■ Article 2, § 1 of the Wyoming Constitution establishes the separation of powers doctrine:

> The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted.

In *Billis v. State*, 800 P.2d 401 (Wyo. 1990), we rejected the "air tight compartment" view of the separation of powers doctrine and determined instead that our state's framers intended to integrate dispersed powers into a balanced, workable government. 800 P.2d at 415. The Tribes argue that, under a "balanced, workable government" approach to the separation of powers doctrine, the district court was not foreclosed from assigning the duties of administering state water within the reservation to the tribal water agency. They contend that the remedial action undertaken in the instant case was within the district court's broad equitable authority to see that its judgments and decrees are respected. We disagree.

Article 1, § 31 of the Wyoming Constitution recognizes that state control of water is essential to the development and prosperity of Wyoming.[8] To this end, the constitution declares that "[t]he water of all natural streams, springs, lakes or other collections of still water" within the boundaries of Wyoming is the property of the state. Wyo.Const. art. 8, § 1.[9] The constitution provides for the administration of state water as follows:

> There shall be constituted a board of control, to be composed of the state engineer and superintendents of the water divisions; which shall, under such regulations as may be prescribed by law, have the supervision of the waters of the state and of their appropriation, distribution and diversion, and of the various officers connected therewith. Its decisions to be subject to review by the courts of the state.

Wyo.Const. art. 8, § 2.

> There shall be a state engineer who shall be appointed by the governor of the state and confirmed by the senate; he shall hold his office for the term of six (6) years, or until his successor shall have been appointed and shall have qualified. He shall be president of the board of control, and shall have general supervision of the waters of the state and of the officers connected with its distribution. No person shall be appointed to this position who has not such theoretical knowledge and such practical experience and skill as shall fit him for the position.

Wyo.Const. art. 8, § 5.

As is apparent from the text of the constitution, the state engineer is a constitutionally designated officer of the executive branch of government. He is appointed by the governor and must be approved by the senate as an individual who is qualified to fulfill the position's requirements. The state engineer is responsible for generally supervising both the use of state water and such subordinate officers as are associated with its distribution.[10]

■ The constitution also addresses the removal of executive officers:

> Except as hereafter provided, all officers not liable to impeachment shall be

**8.** Article 1, § 31 of the Wyoming Constitution provides:
> Water being essential to industrial prosperity, of limited amount, and easy of diversion from its natural channels, its control must be in the state, which, in providing for its use, shall equally guard all the various interests involved.

**9.** Because Congress, in admitting Wyoming to the Union, 26 Stat. 222, ch. 664, ratified the Wyoming Constitution, it clearly contemplated that whatever superior rights it might temporarily or permanently hold in the waters of this state, the underlying ownership and control would remain with the State. *Big Horn I*, 753 P.2d at 114.

**10.** The governor also appoints the superintendents of Wyoming's four water divisions and the commissioners of the various water districts. Wyo.Stat. §§ 41-3-503 (1977) & 41-3-603 (Supp.1991).

subject to removal for misconduct or malfeasance in office as provided by law. Any person appointed by the governor to serve as head of a state agency, or division thereof, or to serve as a member of a state board or commission, may be removed by the governor as provided by law. Wyo.Const. art. 3, § 19. The state engineer is not subject to impeachment. *State ex rel. Hamilton v. Grant,* 14 Wyo. 41, 81 P. 795 (1905). The law which has been provided by the Wyoming legislature relating to the removal of the state engineer and other governor appointees reads in pertinent part:

(a) Notwithstanding any other provision of law, any person may be removed by the governor, at the governor's pleasure, if appointed by the governor to serve as head of a state agency, department or division, or as a member of a state board or commission.

. . . .

(c) Reason for removal of appointed officers or commissioners shall be mailed or delivered to the person to be removed.

Wyo.Stat. § 9–1–202 (1991).

■ Neither the constitution nor the statutes contemplate that a district court should have the authority to remove or replace the state engineer as the administrator of Wyoming water. *Cf.* Wyo.Const. art. 5, § 10 (powers of district court). The state engineer is an executive officer appointed by and subject to removal by only the governor of Wyoming. *See People ex rel. Emerson v. Shawver,* 30 Wyo. 366, 222 P. 11 (1924). The district court's primary role in the instant case was to adjudicate the nature, extent, and relative priority of competing water interests in the Big Horn River System. *See* Wyo.Stat. § 1–37–106 (1988). We hold that the district court had no "inherent equitable enforcement authority," as argued by the Tribes, to effectuate a *de facto* removal and replacement of the state engineer as the administrator of state water within the reservation. A contrary position would result in a most unbalanced and unworkable form of government. The

district court's action violated not only the separation of powers doctrine embodied in the Wyoming Constitution, but also the constitutional charge that the state engineer shall have "general supervision of the waters of the state." Wyo.Const. art. 8, § 5.

As to the Tribes' concern that the separation of powers doctrine should not be applied in such a manner as to make the state engineer immune from judicial enforcement of the 1985 decree, we agree. The state engineer is obligated by the Wyoming Constitution to "equally guard all the various interests" in the water of the State of Wyoming. Wyo.Const. art. 1, § 31; *Big Horn I,* 753 P.2d at 115. Of the various interests to be protected is the Tribes' reserved water right. *Big Horn I,* 753 P.2d at 115. If the district court were to find in a future proceeding that the state engineer had shunned this constitutional mandate, then appropriate enforcement action should be undertaken. Our objection to the district court's action in the instant case goes only to the method employed, not to the underlying principle that the court should have authority to compel compliance with its lawful judgments and decrees.

In addition to the constitutional arguments addressed above, the State contends that the district court's action constituted an abuse of discretion, that it was contrary to the spirit of the McCarran Amendment,[11] and that it violated the law of the case. While we find merit in each argument, we decline to address the arguments in detail in light of our determination that the district court's action violated the Wyoming Constitution. Suffice it to say that it has been repeatedly recognized during the course of this adjudication that unified administration by the state engineer of both reserved and state-permitted rights to Wyoming water is essential to effective water management within the Big Horn River System. *See Big Horn I,* 753 P.2d at 114–15, the 1985 decree, and the 1983 decision.

This court addressed the role of the state engineer as the administrator of the Tribes'

---

11. 43 U.S.C. § 666 (1988).

reserved water right in *Big Horn I.* We limited the state engineer's authority as the administrator in two respects. We initially acknowledged that the Indian reserved water right existed independent of state law and procedure regarding the perfection of usufructuary rights to Wyoming water. We then determined that the state engineer, as the monitor of the Indian reserved water right, could not shut down tribal headgates once he believed that the Tribes had exceeded either the nature or the extent of their decreed right. We explained that, assuming cooperative efforts were of no avail, the state engineer would have to seek judicial enforcement of the decree against the United States and the Tribes. *Big Horn I,* 753 P.2d at 114–15.

 Our present decision is consistent with the duties and limitations imposed upon the state engineer in *Big Horn I.* The state engineer remains responsible to distribute the water within the Big Horn River System according to the nature, extent, and priority of right. When the nature, extent, and priority of the Indian reserved water right are clear and not respected by state appropriators, the state engineer must exercise his authority over the state appropriators to see that the tribal right is observed. When, on the other hand, it is impossible to determine if the tribal right is being violated because the right itself is in some respect ill-defined, the state engineer should promptly seek clarification from the district court so that appropriate remedial action, if needed, may be undertaken. *See* Wyo.Stat. §§ 1–37–106 & 1–37–110 (1988). Should the state engineer determine that the Tribes violated the decree, he should execute an enforcement action as outlined in *Big Horn I* and summarized in the preceding paragraph.

Reversed.

THOMAS and CARDINE, JJ., join on the first issue.

THOMAS and BROWN (Retired), JJ., join on the second issue.

THOMAS, J., files a specially concurring opinion.

CARDINE, J., files an opinion concurring on the first issue and dissenting on the second issue.

BROWN, J. (Retired), files an opinion dissenting on the first issue and concurring on the second issue, GOLDEN, J., joins in the part dissenting on the first issue.

GOLDEN, J., files a dissenting opinion, BROWN, J. (Retired), joins in the part dissenting on the first issue.

THOMAS, Justice, concurring specially.

I agree with the decision reflected in the opinion of the Court. I would invoke a different rationale for reaching the same result. The essence of that rationale is set forth in the dissenting opinion that I filed in *In Re General Adjudication of All Rights to Use Water in the Big Horn River System,* 753 P.2d 76 (Wyo.1988), *cert. granted* 488 U.S. 1040, 109 S.Ct. 863, 102 L.Ed.2d 987 (1989), *aff'd sub nom. Wyoming v. United States,* 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342, *reh'g denied* 492 U.S. 938, 110 S.Ct. 28, 106 L.Ed.2d 639 (1989) (by an equally divided court) (*Big Horn I*). I am persuaded that the real battle in this case is now over sovereignty, not over water.

If the issue to be addressed is sovereignty, I am satisfied that the thrust of the opinions of this court in *State v. Moss,* 471 P.2d 333 (Wyo.1970), *appeal after remand* 492 P.2d 1329 (1972), and *Blackburn v. State,* 357 P.2d 174, *reh'g denied* 357 P.2d 1111 (Wyo.1960), is that the part of the Wind River Indian Reservation, which was included in the Act of March 3, 1905, was disestablished as an Indian reservation. Even though the title to the land was in major part returned to the Indian tribes, the return of title only did not have the effect of again establishing the reservation. According to our decision in *Big Horn I,* there was no effect upon the reserved water rights, but that result is attributable to the stipulation of the parties with respect to the geographic area and the legal concept that property right was created at an earlier time when the Wind River Indian Reservation was created initially. We did

not consider the doctrine of sovereignty in *Big Horn I.*

The paramount issue, as I view this case, is the question of who is to regulate water rights on the Wind River Indian Reservation. In my earlier dissent in *Big Horn I*, I set forth the reasons for concluding that the ceded portion of the Wind River Indian Reservation was disestablished as a reservation and that the efficacy of the constitution and law of the State of Wyoming within the ceded portion must be recognized. On the basis of that conclusion, I am satisfied that only the State Engineer can regulate on the ceded portion of the reservation. While it is possible to debate the significance of the language used, I hold the view that it is the law of this case that the right to regulate the use of the recognized water rights is vested in the State Engineer. In the absence of any sovereign rights in the Tribes in the ceded portion of the reservation, he must regulate the use of water there. Since the State Engineer is the exclusive regulatory authority for the use of water on the ceded portion of the Wind River Indian Reservation, he should also regulate on the diminished portion. Pragmatically, it does not make sense to have two regulatory authorities.

Even if I concede the authority of the trial court to nominate a different regulatory authority during the pendency of the litigation, I still must agree to reverse the appointment of the Tribal Water Board. If the manager is not to be the State Engineer, it must not be one of the antagonists in this litigation. I am of the view, however, that, even though there remain to be adjudicated the non-Indian rights, those rights now are represented by either permits or adjudicated rights under the law of the State of Wyoming. I am not certain that the pending litigation can interfere with the duty of the State Engineer to regulate the use of water under such rights or permits until they are adjusted by court decree in this litigation.

The water issue with respect to the reserved rights of the Indian peoples and individuals already has been resolved. Reserved water in favor of federal reserva-

tions, however, is a matter of property law. It has nothing to do with sovereignty. I find nothing set forth in the case of *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), to suggest that it addresses anything beyond a concept of property law. As federal courts have recognized, such a property right is subject to state regulation. *E.g., United States v. Adair*, 723 F.2d 1394 (9th Cir.1983), *cert. denied sub nom. Oregon v. United States*, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). This must be particularly true when the geographical area in which the rights attach is not subject to the sovereignty of the Indian tribe.

I have to concede that logic would demand that the sovereignty of the Indian tribes be recognized as to the diminished portion of the reservation. My compromise with that logic is limited to the resolution of this case. In this instance, however, pragmatism must control over logic. In the long view, it would make little sense to divide the regulatory function because of the clear interrelationship of the water courses and systems on the ceded and diminished portions of the Wind River Indian Reservation. I am satisfied that, after the conclusion of this litigation, the Shoshone and Northern Arapaho tribes could not constitutionally regulate the waters on the ceded portion and, consequently, the appropriate order for the court to enter with respect to administration of the water in the context of continuity over the long range is to order the State Engineer to assume that function.

When I reach the conclusion that the water in the Big Horn River must be subject to the administration of the State Engineer, that resolves the question of instream flow. The State Engineer has no authority to manage the waters of the state other than in consonance with the constitution and law of the State of Wyoming. Consequently, while instream flow might not be foreclosed, it must be recognized as a permissible utilization of the water in accordance with Wyoming law, if it is to be accomplished at all. Certainly, any effort on the part of the Shoshone and Northern Arapaho tribes to create a right to an in-

stream flow use out of what is now only paper water, as a matter of self help, must be a nullity.

I would reverse the order of the district court with instructions to appoint the State Engineer to manage the use of water on the Wind River Indian Reservation, both the rights subject to adjudication and other rights and permits. I would then require that state law be invoked with respect to any change of use or the implementation of any right to instream flow.

CARDINE, Justice, concurring in part and dissenting in part.

Water is too scarce, too precious a commodity in the arid west to do other than assure that it is the subject of highest and best use by all. The time for accommodation, mutual respect and reasonableness has arrived.

On the first issue, I would hold that a paper water right, one that has never been applied to practicable irrigable acreage or subsumed uses, may not be transferred to instream flow. This holding would prevent the transfer of future water to instream flow as applied for and before us in this appeal.

The majority has held that Wyoming law governs future tribal water. It is hard to imagine that when the question of historical water is before us, that it would be governed by different law than that governing future water. Therefore, I disagree with the majority's implicit holding that change of use of any tribal water right (whether future, historical or a future right later applied to practicable irrigable acreage or subsumed uses) may not be to instream flow simply because Wyoming law allows only the state of Wyoming to own an instream flow right. Instead, I would hold that any historical water right or future water right applied to practicable irrigable acreage may be transferred to instream flow under federal law or rules and regulations adopted by the Tribes that may, within reasonable limits, be more liberal than Wyoming law.

On the administration issue, I do not agree that Wyoming law governs the ad-

ministration of Indian water rights. Nor do I agree that the State Engineer should administer the tribal water rights to the exclusion of the Tribes. I would hold that they jointly administer the water rights on the reservation and, in the event of disagreement, must turn to the court for resolution of their dispute.

My opinion here rests primarily on what I believe *ought* to be done, rather than on what has been said and done in the past. Therefore I cite little established precedent. I do explain how basic principles of Western water law, common sense, and comity support my proposals.

I believe each side in the current controversy errs by leaning too far toward either state or federal law and control. Administration of Indian water rights is accomplished through a delicate and cooperative interplay between state and federal law. When the balance between these laws is tilted too far in either direction, it results in harm to the orderly system of management and fairness for all water users.

*Use of Future Project Water for Instream Flow*

The majority opinion purports to address only "future project water," that is, water that is quantified and included in the reserved right but not yet put to beneficial use. However, its holding that W.S. 41–3–1002(e) precludes a private instream flow right for the Tribes can be read as precluding dedication of *existing* irrigation rights as well. In addition, the majority notes in dicta that if the Tribes sought to change the use of a reserved water right to another use "permitted by law," they would have to comply with our change of use statute, W.S. 41–3–104. Since I believe that the Tribes are free to promulgate their own standards for instream flow rights and for change of use which may, within reasonable limits, be more liberal than Wyoming law, I must dissent from these portions of the majority opinion.

I would hold, however, that future water may not be transferred to instream flow without first being put to beneficial use for

irrigation purposes. My conclusion is bolstered both by the beneficial use concept and by the rule that reserved water rights are reserved only to fulfill the purposes of the reservation. *United States v. New Mexico*, 438 U.S. 696, 700, 98 S.Ct. 3012, 3014, 57 L.Ed.2d 1052 (1978).

The danger in the absolutist position that federal law governs all aspects of reserved rights is that carefully developed policies of state water law relating to particular conditions of water use may be ignored. One such policy in Wyoming and other Western states is the beneficial use concept. Beneficial use is the foundation of Western water law. It is incorporated into our constitution, which states that "[p]riority of appropriation for beneficial uses shall give the better right." Wyo. Const. Art. 8, § 3.

It is true that the Tribes have a federal water right which is reserved and exempted from appropriation by others under State law. *Winters v. United States*, 207 U.S. 564, 577, 28 S.Ct. 207, 212, 52 L.Ed. 340 (1908). Furthermore, "Federal water rights are not dependent upon state law or state procedures and they need not be adjudicated only in state courts." *In re General Adjudication of All Rights to Use Water in the Big Horn River System*, 753 P.2d 76, 114 (Wyo.1988) (*quoting Cappaert v. United States*, 426 U.S. 128, 145, 96 S.Ct. 2062, 2073, 48 L.Ed.2d 523 (1976)), *aff'd sub nom. Wyoming v. United States*, 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342 (1989), *reh'g denied* 492 U.S. 938, 110 S.Ct. 28, 106 L.Ed.2d 639 (1989) (*Bighorn I*). However, state concepts such as "beneficial use" may supply guidance in determining the scope of reserved rights. *Colville Confederated Tribes v. Walton (Colville III)*, 752 F.2d 397, 400 (9th Cir.1985). I would hold that a "paper" reserved right must be put to beneficial use before it can be allowed to interfere with the rights of state appropriators.

This is only consistent with making the highest and best use of the water for all. Indian reserved rights are subject to this principle. *Cf.* P. Maxfield, M.F. Dietrich & F. Trelease, *Natural Resources Law on American Indian Lands* 213 (1977): "[Indian water rights] cannot be claimed on a dog-in-the-manger basis; when the Indian right is not *in use,* the water may be taken and used by others having inferior rights." (emphasis added) It is simply unjust to require appropriators who must put their water to beneficial use to stand by and watch the Tribes waste water at their expense.

This leads us to the crux of the matter, which is whether instream flow is a beneficial use. In responding to this question, we must carefully consider the special qualities of reserved rights. The 500,000 acre feet reserved water right here is set aside for the Tribes and available *forever* for application to the land. The right to acquire a water right from the 500,000 acre feet awarded is owned by the Tribes and the federal government and is not subject to loss through abandonment or otherwise. The reserved right looks *backward* for priority purposes to the establishment date of the reservation. Thus, reserved rights escape many of the limitations imposed by the prior appropriation system. Since they are in derogation of this system, by which all other appropriators must live, their scope should be carefully limited to avoid undue prejudice to those who receive their rights under state law. I propose that one such limitation is that reserved rights cannot be considered beneficially used until they are used for the purposes *for which they were reserved.* In the case of the Bighorn reserved rights, that purpose was irrigation.

We said in *Bighorn I*, 753 P.2d at 96:

[W]e have no difficulty affirming the finding that it was the intent at the time to create a reservation with a sole agricultural purpose[;]

and at page 99:

The district court did not err in finding a sole agricultural purpose in the creation of the Wind River Indian Reservation. The Treaty itself evidences no other purpose, and none of the extraneous evidence cited is sufficient to attribute a broader purpose[;]

and at page 112:

In the case at bar, the purpose of the reservation for which water is reserved is narrow—agricultural only.

Therefore, I would hold that the Tribes' rights, to be initially defined as beneficially used, must first be put to use for agricultural purposes.

Having said this, I do recognize that Indian water rights must be interpreted with sufficient flexibility to allow for change in use which may be needed when the needs of the Tribes also change. *See e.g., Colville Confederated Tribes v. Walton (Colville II),* 647 F.2d 42, 47 (9th Cir. 1981). Therefore, once a paper right has been converted to beneficial use by actually being applied to the practicably irrigable acreage, I would allow the Tribes to apply to change their use of the water. I would make this change subject to a reasonable set of procedures, which may be more liberal than those contained in Wyoming law.

I disagree with the majority that a change of use must be hamstrung by compliance with Wyoming statutes defining acceptable uses and procedures for change of use. I also disagree with the majority's position that Wyoming law now applies to prevent the Tribes from obtaining *any* instream flow right. Although Wyoming *statutes* prohibit any but the State from obtaining an instream flow, within the broad ambit of the *constitutional* beneficial use concept, an instream flow may be a permissible use by the Tribes. The federal water right owned by the Tribes is subject only to the beneficial use concept in its broadest sense, not as it has been interpreted in a particular statute. Therefore, I would allow the Tribes to develop an instream flow right.

My primary concern is that the change of use must be orderly and gradual so as to minimize the devastating effect of an enormous dedication to instream flow of water that has never before, and is not now, being used for beneficial purposes. Although the "sensitivity doctrine" contained in *United States v. New Mexico,* 438 U.S. at 718, 98 S.Ct. at 3023 (Powell J., dissenting in part), was rejected in the particular context of *Bighorn I,* at 111–12, this is an ideal stage for its application. The rights of appropriators under state water law, and the congressional policy of deference to state water law, must be respected.

The benefits that result from my proposed disposition are many. First, those farmers and ranchers who, for generations, had an adequate, reliable source of irrigation water will not be ruined, bankrupted over night by their neighbor and now new senior appropriator, the Tribes, who profess their firm intention to keep approximately 200,000 acre feet of reserved paper water never before beneficially used in the river, leaving little or no water for diversion for irrigation. Second, these farmers and ranchers know that as time passes the Tribes will probably apply their reserved water right to the practicable irrigable acreage, the effect of which will be to gradually diminish the water available to the now junior rights of these farmers and ranchers. This water may also eventually be applied to instream flows. But the irrigators who share the water with the Tribes will have time to adjust their operations, return some land to dry farming, range land, or some other use. Each of the parties will have time to adjust to the new realities of their situation with time for study and adjustment. All of the water will more likely be applied to its highest, best and most beneficial use benefitting all who reside in Wyoming.

*Joint Administration of the River System*

I do not agree that Wyoming law governs the administration of Indian water rights. As we stated in *Bighorn I,* "[t]he role of the state engineer is * * * not to apply state law, but to enforce the reserved rights as decreed under principles of federal law." 753 P.2d at 115. The scope of the McCarran Amendment, 43 U.S.C. § 666 *et seq.,* does not change the fact that federal law governs Indian reserved rights. Although suit for administration of water rights in a river system, including reserved rights, may be brought in state court, disputes concerning reserved rights are federal questions which may be reviewed by the United States Supreme Court. *United States v. District Court, In and For Eagle*

*County, Colorado,* 401 U.S. 520, 526, 91 S.Ct. 998, 1003, 28 L.Ed.2d 278 (1971).

Nor do I agree that the State Engineer should administer the tribal water rights to the exclusion of the Tribes. The Indian reserved water is not "state water" as the majority claims. I would hold that the Indians and the State Engineer jointly administer the water rights on the reservation and, in the event of disagreement, must turn to the court for resolution of their dispute. We may find that ultimately it will be necessary for the court to administer the division and application of this water much as the courts have overseen and affected integration of schools. The parties must adopt a new spirit of cooperation with each other. They must stop this wasteful, expensive, useless litigation and move toward this common goal. The resolution of the administration and use of water urged in this concurring and dissenting opinion charts a reasonable middle ground rather than the win-all and lose-all extremes advocated by the parties in their repeated adversarial confrontations. For the reasons stated, I concur in part and dissent in part.

BROWN, Justice (Retired), concurring in part and dissenting in part, with whom GOLDEN, Justice, joins on the part dissenting to the first issue.

I agree with Justice Golden and join in his dissent on the first issue of this case.

My principal concern with the proposed majority opinion is that it does not give proper effect to the 1868 Treaty of Ft. Bridger, July 3, 1868, 15 Stat. 673. It must be remembered that the Tribes' water rights flow from the Treaty of 1868 and not from an appropriation under Wyoming law. The majority opinion treats the Tribes' reserved water right substantially the same as an appropriation under Wyoming statutes. The effect of the majority determination is to make marginal farmers out of the Tribes forever. This defeats the purposes for which the Reservation was created.

The court's opinion in *In re General Adjudication of All Rights to Use Water in the Big Horn River System,* 753 P.2d 76 (Wyo.1988), *cert. granted in part* 488 U.S. 1040, 109 S.Ct. 863, 102 L.Ed.2d 987, *judgment aff'd* 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342, *reh'g denied* 492 U.S. 938, 110 S.Ct. 28, 106 L.Ed.2d 639 (1989) (*Big Horn I*) was fashioned by a committee and organized by an editor. It does not state what issues were being decided. It is hard to determine exactly what portion of the district court judgment was reversed and what portions of the 1983 decision and the 1985 decree were left intact. It is not clearly stated in the opinion how the Tribes' request for additional water for fisheries, minerals, industrial, wildlife and aesthetics was resolved. In examining the 1988 opinion of this court, a reader cannot find where a change of use issue was ever considered. The majority, however, quotes portions of *Big Horn I* out of context and bootstraps the case to support its determination in the case before us.

The special master awarded the Tribes approximately 500 cubic feet per second (cfs) as a reserved water right for agricultural and subsumed purposes. In the adjudication proceeding, the Tribes had also asked for a declaration of a reserved water right for fisheries, mineral, industrial, wildlife and aesthetics. The special master recommended an award for these purposes. The district court, however, disallowed a reserved water right for fisheries, minerals, industrial, wildlife and aesthetics. The Tribes appealed the denial of these reserved water rights. The Wyoming Supreme Court affirmed the district court in denying a reserved water right for fisheries, mineral, industrial, wildlife and aesthetics. 753 P.2d at 98–99.

The majority pumps air into its *Big Horn I* decision, then cites the enhanced opinion for its determination that the Tribes cannot change their right to divert water for agricultural purposes to an instream flow for fisheries. There were numerous issues in *Big Horn I*, all parties having appealed some part of the district court's judgment. However, there was no issue regarding changing part of the reserved right for agricultural purposes to a right to instream

flow for fishery purposes. The majority cites *Big Horn I* for a proposition that was never an issue in that case; nor was it even discussed. If the majority is determined to hold that the Tribes cannot effect a change in use to an instream flow, it should find some authority other than *Big Horn I*. The trouble, of course, is it cannot find any such authority. All authority is to the contrary. *See Arizona v. California*, 439 U.S. 419, 99 S.Ct. 995, 58 L.Ed.2d 627 (1979).

The majority opinion holds that the Tribes are subject to Wyoming law with respect to the use of their reserved water right. This determination flies in the face of a large body of law. The majority opinion makes no distinction between the Tribes' reserved water right and an appropriation under Wyoming law. As aforesaid, such determination cannot be supported by what the court said in *Big Horn I*.

In the Joffe and Johnson decrees, it was stated several times and in several ways that the Tribes are entitled to make such use of the water covered by their reserved water right as they deem advisable. In his Amended Judgment and Decree dated May 15, 1985, Judge Johnson held in paragraphs 8 and 9 at page 17:

> 8. The Tribes are entitled to make such use of the water covered by their reserved water rights they deem advisable but the use is confined to the reservation and in no event shall the consumptive use be increased.
>
> 9. The Tribes can sell or lease any part of the water covered by their reserved water rights but the said sale or lease cannot be for exportation off of the reservation and in no event shall the consumptive use be increased.

In his Decision dated May 10, 1983, Judge Joffe had made an identical determination at paragraphs 8 and 9 of the section entitled Judgment and Decree, at page 70. Judge Joffe additionally stated in the discussion section of his Decision:

The Court states again the premise that the determination of "historic" acreage and "practicably irrigable acreage" is used *only* as a measuring device to calculate the Tribes present and future needs. The requirements of an adjudication of a reserved right are different than those of a state awarded water right. The granting of a reserved right does not limit the usage of the water nor does it compel the Tribes to use the water on any particular tract of land. When the Tribes determine where and how they wish to use the water granted in this decree, they will inform the proper authorities who will then be able to make the specific determinations which are necessary for administration of a water right.

*Id.* at 36.

It is difficult to see how the majority can dance around the clear holdings of two district judges. This determination by Judges Joffe and Johnson was not reversed by this court in *Big Horn I* and is therefore the law of the case.[1] The majority opinion summarily disposes of the Joffe and Johnson decrees by saying that reliance upon the 1983 decision or upon the 1985 decree is not justified. Then the majority quotes out of context statements from *Big Horn I* that had nothing to do with the Tribes' reserved water right for agricultural purposes or a change in use.

After this court entered its decision in *Big Horn I*, affirming the Tribes' right to use their water as they deem advisable, Wyoming filed a Petition for Rehearing or, in the Alternative, for Reconsideration and Clarification, in which it admitted the broad range of uses to which the Tribes could put their water pursuant to this Court's decision:

> Under the rationale suggested by Judge Johnson, once the reserved water right is quantified for irrigation it arguably may be used for virtually any purpose on the Reservation.... The Tribes are entitled to make such use of the

---

1. In fact, the only portions of the district court decrees that the Wyoming Supreme Court reversed were (1) an adverse ruling on the Walton claims, and (2) the award of water to the Tribes should be reduced overall by ten percent.

water covered by their reserved water rights as they deem advisable but the use is confined to the Reservation and in no event shall consumptive use be increased.

... the Tribes may decide that their "future" projects may never be built or may be significantly delayed and if so, the Tribes may decide to unilaterally convert their reserved right for future projects into the fisheries flows denied by this Court.

Petition for Rehearing at 44 (emphasis added); see also Brief of Appellee State of Wyoming in Response to the Appellants' Briefs of the United States and Tribes (Type 2 claims) at 86–87 (since Tribes may use their reserved water right for other non-agricultural purposes, Tribes not entitled to an additional and separate water award). Wyoming, therefore, explicitly asked that this Court amend its ruling insofar as it authorized the Tribes to dedicate their water to uses other than irrigation, including instream flows. Petition for Rehearing at 45. This court denied that request.

Wyoming adopted the same position before the United States Supreme Court in support of its argument that the "practicably irrigable acreage" quantification standard created a windfall for the Tribes. In its brief before the United States Supreme Court, Wyoming argued:

The rights received are no longer subject to the limitations of state law regarding continued use (without which they would be subject to abandonment) or transfer to different uses (for which there may be no injury to other water users).

Brief of Petitioners, In the Supreme Court of the United States, Wyoming v. United States, Case No. 88–309 at 33–34 (emphasis added and footnote omitted). That argument was rejected. Wyoming v. United States, 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342 (1989).

The State of Wyoming had no trouble understanding the court's opinion in Big Horn I when it petitioned for a rehearing and in its appeal to the United States Supreme Court. The law of this case and its

ramifications have been clear throughout this litigation. The district court, this court, and the United States Supreme Court recognized that the Tribes are entitled to dedicate their decreed water to instream flows. Apparently the district court disallowed the special master's recommendation for a reserved water right for fisheries, mineral, industrial, wildlife, and aesthetics because the Tribes already had a substantial amount of reserved water (500 cfs) quantified for agriculture. According to the district court, this reserved water right could be used for any purpose. All parties understood how the Tribes could use their reserved water until this appeal. The State should be estopped from changing the position it took in its petition and argument for rehearing in Big Horn I and the position it took in its appeal of Big Horn I to the United States Supreme Court.

I agree with appellants that the State Engineer should control and manage the water, the subject matter of this litigation. I am influenced in my vote because the majority has determined that the Tribes' future water right cannot, at this time, be transferred to instream flow. A provision for dual management would be unworkable, exacerbate a power struggle, and invite continued litigation. Despite the posturing reflected in the five separate opinions, the court's holding is very narrow: a majority of the court has determined that the State Engineer manages the water. A different majority has determined that the Tribes' future water right cannot, at this time, be transferred to instream flow. Considering the two narrow issues decided in our opinion, the State Engineer should not experience the difficulty with "gray areas" that he experienced in interpreting Big Horn I.

I would affirm the district court on Issue Number 1, and reverse on Issue Number 2.

GOLDEN, Justice, dissenting, in which BROWN, Justice (Retired), joins, on the first issue.

In this appeal we review issues relating to enforcement of a portion of the district

court's decree adjudicating waters in the Big Horn River system, which we have already reviewed on two prior occasions, though in two entirely different contexts. *See In Re Rights to Use Water in the Big Horn River (Big Horn I)*, 753 P.2d 76 (Wyo.1988), *aff'd mem. sub nom. Wyoming v. United States*, 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342 (1989); *In Re Rights to Use Water in the Big Horn River System (Big Horn II)*, 803 P.2d 61 (Wyo.1990).

## INTRODUCTION ·

For ease of reference, the parties are identified:

*Appellants:* State of Wyoming, the G.A. Brown Testamentary Trust, the LeClair Irrigation District, the Midvale Irrigation District, the Riverton Valley Irrigation District, and a group of individual and business entities who are irrigators affected by the adjudication (hereinafter referred to collectively as appellants or by individual name, as circumstances require).

*Appellees:* United States, in its role as trustee for the Indian Tribes and as holder of various reserved water rights for national forest lands and other purposes, and the Shoshone and Arapaho Tribes (hereinafter referred to as the United States and the Tribes).

The Wyoming Wildlife Federation and the National Wildlife Federation appeared as *amici* with the Tribes.

Based upon the original decrees, the Indian Tribes sought to commit a portion of their reserved water rights to an instream flow on three critical stretches of the Big Wind River for the purposes of fishery enhancement, groundwater recharge, benefit to downstream irrigators and other benefits. The Tribes continued to commit their historic water for the agricultural and domestic purposes for which it had been traditionally used. They requested use of future water for instream flow purposes. The Tribes presented their Tribal Permit to the state engineer for enforcement in April of 1990, but the state engineer considered the Tribes' "right" to commit any portion

of their waters to instream flow a "gray" area and, rather than enforcing the permit to the letter, he attempted to balance the rights of the appellants with the request for the instream flow. The state engineer was able to provide all irrigators with sufficient water during the pertinent time period, but was not able to fulfill the Tribes' instream flow demand. However, at least a portion of the instream flow was achieved at all times and, after the middle of July 1990, it was maintained at approximately the levels requested by the Tribes.

Because the state engineer did not strictly enforce their instream flow permit or recognize their right to commit a portion of their adjudicated water to an instream flow, the Tribes petitioned the district court for enforcement. As we made clear in *Big Horn I*, the district court is the proper source of their remedy as provided by the decree itself. A special master was appointed to hear all evidence and he reported to the district court. The district court essentially adopted the special master's report and decreed that the Tribes "may change their reserved water right to instream flow without regard to Wyoming state water law." The Tribes had also requested that the state engineer be replaced as the water master on the reservation and the district court granted that relief by appointing the Tribes' Water Resources Agency as the administrator of all surface waters on the reservation, both Indian and non-Indian alike. The appellants challenge both rulings.

## ISSUES

Appellants offer two issues for this court's review. Although the phraseology used varies somewhat from appellant to appellant, it suffices to repeat here the statement of issues provided by the State of Wyoming:

I. Whether the Tribes may convert a federal reserved right to divert in the future into a present instream flow.

II. Whether the District Court erred in substituting the Tribal Water Resources Agency for the state engineer as admin-

istrator of all water rights within the reservation.

The Tribes and the United States perceive the issues similarly. The Tribes' statement of the issues follows:

A. Whether the district court correctly confirmed that the Shoshone and Northern Arapahoe Tribes may use their reserved water right for instream flows to restore and enhance fisheries without first obtaining the state engineer's approval.

B. Whether the district court's appointment of the Tribes' water agency as water master to regulate state-law water rights on the Wind River Indian Reservation was clearly erroneous.

## THE TRIBES' RIGHT TO AN INSTREAM FLOW

The Tribes rely on the language of the district court decrees which manifest that they may use the reserved water rights, whether waters they have used historically or waters which were adjudicated to them for future needs, as they determine best fit their needs:

This court, thus, calculates the Tribes' entitlement to a reserved water right, with a priority date of 1868, based on the purpose of agriculture (which term includes livestock use and domestic use) and denies such reserved water right for other multi-purpose uses as claimed by the Tribes. The Court by such finding does not intend to dictate to the Tribes that they are restricted as to the use of said reserved water only for the purpose of agriculture, inasmuch as it recognizes that it cannot tell the Tribes how they must use the water that comes under a reserved water permit. If the Tribes desire to use so much of their water for other purposes, they may do so.

Judge Joffe, Decree at 20 (May 10, 1983).
The Court states again the premise that the determination of "historic" acreage and "practicable irrigable acreage" is used only as a measuring device to calculate the Tribes' present and future needs. * * * When the Tribes determine where and how they wish to use the water

granted in this decree, they will inform the proper authorities who will then be able to make the specific determinations which are necessary for administration of a water right.

*Id., at 36.*

The tribes are entitled to make such use of the water covered by their reserved water rights as they deem advisable but the use is confined to the reservation and in no event shall the consumptive use be increased.

Judge Johnson, Amended Decree at 17, ¶ 8 (May 15, 1985).

The reserved water right quantified by Judge Joffe does not deny the Tribes the ability to regulate in-stream flows in order to maintain what may be considered necessary water for optimum fish habitat, nor does the opinion limit any such power that may exist on the part of the Tribes. The Tribes may seek to dedicate their stream flows for fish habitat by using water reserved to them by this decision.

Judge Hartman, Order at 7 (March 11, 1991), quoted from June 4, 1984 Order.

The appellants discern a "gray" area based on the interaction of paragraphs 2 and 8 of the conclusions of law in the original decrees. Paragraph 2 describes the reserved water right in terms of a right to divert water. The appellants then go on to reason that, although the right is reserved and may be dedicated to instream flows, the water must first have been diverted to some other use. An instream flow does not require a diversion. I simply cannot accede to such a reading of the decree. At best it is obtuse and insensitive to the Tribes' property right in the adjudicated water. At worst it is duplicitous. In order to adopt this line of argument, we would be required to hold, as Justice Cardine postulates, that the Tribes were adjudicated the ownership of the water, but they may not use it unless first diverted to an agricultural use. Nothing in the decree or any subsequent rulings of the district court, or of this court, or of the United

States Supreme Court[1], serves to support such a conjuration.

Whether the Tribes could utilize their water rights, whether historic or future, for other purposes was not raised as an issue in *Big Horn I*. It is so abundantly clear that if the issue had been raised, this court could only have held that the Tribes may put their water to uses consistent with their needs without regard to the traditional water law of Wyoming and, harsh as it may sound, the needs of other water users who are subordinate to the Tribes. The primary issue in *Big Horn I* was quantification, and we simply were not presented with the issue of other uses nor did we respond to that issue in the majority opinion.

Justice Macy would now have us believe that *Big Horn I* "clearly and unequivocally" determined the question of other uses and that "[i]f we had intended to specify what the water could be used for merely as a methodology to determine the amount of water the Tribes could use for any purpose, we would have said so." Justice Macy, at 5. If the court had intended to hold in *Big Horn I* that use of water could never be changed to instream flow, the court could have clearly said so, but it did not. Justice Macy places great weight on what he perceives as evidence of prior discussion of "other uses" limitation by relying on the dissents in *Big Horn I*. But the dissenters do little more than state their disagreement with the majority's narrow view in affirming agricultural purpose as the sole method of quantification of rights. *See Big Horn I*, 753 P.2d at 117 (Thomas, J., dissenting; Hanscum, D.J., dissenting). If there is language from the majority in *Big Horn I* which purports to resolve the "other uses" issue, it has not been cited in the present opinion and, indeed, from our careful reading of the opinion we can find none. To suggest otherwise is absolute sophistry.[2]

In addition to the language of the decree itself, there are substantial precedents which mandate recognition that the Tribes may use their water for instream flows. *4 Waters and Water Rights* § 37.02(e) (Robert E. Beck, ed., Michie 1991).

The Tribes do not appear to be asking for an "unfettered" right to use their water for any purpose they desire. *Big Horn I* can only be read to hold that the Tribes may use their water in a manner which is consistent with their best interests so long as the "public right" is not extinguished[3].

---

1. Following the Wyoming Supreme Court's decision, the State of Wyoming sought review on a petition for a writ of certiorari in the United States Supreme Court. The state asked that Court to review three aspects of the controversy: (1) whether reserved rights existed in light of the 1905 second McLaughlin Agreement; (2) if they did, then whether the practicably irrigable acreage standard should be used to measure these reserved rights; and (3) what priority date should attach to ceded lands restored to the reservation. *See* Joseph R. Membrino, *Indian Reserved Water Rights, Federalism and the Trust Responsibility*, 27 Land & Water L.Rev. 1, 8 (1992); and Walter Rusinek, *A Preview of Coming Attractions? Wyoming v. United States and the Reserved Rights Doctrine*, 17 Ecology L.Q. 355, 393–94 (1990). The Tribes filed a cross-petition in which they raised six additional issues. *See* Rusinek, *supra* at 394. Other non-Indian litigants also filed a cross-petition raising yet additional issues. *Id.*

 "Of all the questions raised in petitions and cross-petitions for review by the parties, the United States Supreme Court accepted only Wyoming's challenge to the use of that Court's own measure of practicably irrigable acreage." Membrino, *supra*, at 8; *see also*, Rusinek, *supra*, at 394. On the sole issue reviewed, the Court split four-four, thus affirming the Wyoming Supreme Court's use of the practicably irrigable acreage standard to measure the Indians' reserved rights. Membrino, *supra* at 9. The Court wrote no opinion. *Id.*

2. Seeing something that is not there reminds me of an incident involving Alice:

 "I see nobody on the road," said Alice.
 "I only wish I had such eyes," the king remarked in a fretful tone. "To be able to see Nobody! And at that distance too! Why, it's as much as I can do to see real people in this light!"
 Lewis Carroll, *Through the Looking Glass and What Alice Found There*, at 136 (1872).

3. As described in the cited material, the "public right" is something like the commonweal. That is, if the change in use is injurious to the commonweal, as opposed to injury to certain individuals such as some irrigators, there may be an issue to be resolved. The thrust of the cited article is not much different from what the United States has argued here, i.e., if the injury would occur if the Indians put their water to use, that is not enough; the injury must be

4 *Id.* § 31.03. There simply is no question but that an instream flow is a beneficial use, whether studied under the federal law which must govern in this instance, or studied under traditional Wyoming state water law, which may have some application here as persuasive authority. The Tribes may call for their water for any use to which water may be beneficially put, and if the appellants are aggrieved, then they may take action, consistent with due process of law and in recognition of the Tribes' property rights, to question that use before the district court. The burden of proof in such an instance must be on the appellants, not the Tribes. Thus, if the only injury to other users comes about because the Tribes are actually using their water for instream flow, and that same injury would exist if the water was used to irrigate corn, then there is no injury for which the appellants or the State of Wyoming may seek a remedy. The rights which the Tribes received through *Big Horn I* are property rights. The Tribes may not be deprived of their rights absent due process of law. Wyo. Const. art. 1, § 6; U.S. Const. amend. V, XIV; 16A Am.Jur.2d *Constitutional Law* §§ 598, 804–857 (1979). The process that is due the Tribes is, as stated above, that they first receive the water adjudicated to them—nothing more, nothing less. If the water is within the quantity adjudicated and its use will take place on the reservation, then the state engineer is bound to make that water available as requested.

The Tribes' adjudicated water is not subject to the usual sort of administration by the state engineer as discussed more fully in the second part of this dissent. I would hold that the Tribes may use their water for an instream flow. This is consistent with prior court decisions and the decree as it currently stands affirmed by this court and the Supreme Court of the United States. *Colville Confederated Tribes v. Walton,* 647 F.2d 42, 48 (9th Cir.1981), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630; and *see 4 Waters and Water Rights, supra* § 37.02(e).

In *Winters v. United States,* 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340, 346 (1908), the United States Supreme Court was clearly of the view that the Indians retained "command of the lands and the waters—command of all their beneficial use, whether kept for hunting, 'and grazing roving herds of stock,' or turned to agriculture and the arts of civilization." This broad language does not allow a crabbed interpretation of the proper uses of the reserved water by the Tribes. In *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), the special master shared this view, as has the Solicitor of the Department of the Interior. This demonstrates the agency's conviction to support multiple uses of Indian reserved water rights. *See* Harold A. Ranquist, *The Effect of Changes in Place and Nature of Use of Indian Rights to Water Reserved Under the "Winters Doctrine,"* 5 Natural Resources Lawyer 34, 35 n. 3 and 36 (1972) (referring to Simon H. Rifkind, *Report of the Special Master in Arizona v. California;* Memorandum for the Secretary of the Interior, dated February 1, 1964; and Memorandum to the Regional Solicitor at Los Angeles, dated January 21, 1971). *See also* Membrino, *supra,* note 1, at 24 n. 84, which refers to Solicitor's opinion, February 1, 1964 (Volume II Op.Sol. on Indian Affairs 1930 (U.S.D.I.1979)).

In summary, I would hold the Tribes may use their water, whether it falls into the category of historic water or future water, for any purpose they deem to be to their benefit. In this specific instance, there is no question but that an instream flow is a benefit to the Tribes as well as the public in general. If the appellants, including the State of Wyoming, feel aggrieved by the Tribes' use of their water, they must go to the district court and prove their case and get an order from that court before the flow of the water may be stopped. It is as simple as that. I would earnestly hope that the district court will always perceive the simplicity of the meaning of the Tribes' right to their adjudicated water and shun conjurations, as it did here,

because of something beyond the mere use of the adjudicated water.

which seek to deny implementation of the adjudication. In some instances, such as the implementation of the *Brown* [4] school desegregation case, "time—and time again—" may be made available by the courts to provide transition. Considerable time has already elapsed in this case. There will, no doubt, be additional refinements to be made in the decree in the future. But the status of the law is now clear in this matter. The Tribes have a property right in their adjudicated water and the law securing and protecting it, and those charged with its enforcement must give that property right and that law effect now.

### ADMINISTRATION OF WATER RIGHTS ON THE RESERVATION

Concerning administration of water rights on the reservation the district court determined:

The Tribal agency which regulates reserved water matters shall have the authority to administer all water rights within the stipulated boundaries of the reservation. Non-Indian rights will be administered according to state water law by the Tribal agency, with appropriate judicial review in state district court pursuant to Title 41 of the Wyoming statutes.

Judge Hartman, Judgment and Decree (March 11, 1991).

Appellants allege error by the district court in substituting the Tribal Water Resources Agency in place of the state engineer to administer all water rights within the reservation. The state claims, *inter alia,* violations of the Wyoming Constitution and the law of this case and that the United States Constitution and federal law convey no such authority to the Tribes.

It is helpful to review the appellants' claims on appeal and the district court's disposition of the several issues:

(1) whether the district court's decision "removed" the state engineer from his administrative duties under Wyo. Const. art. 8, § 5;

(2) whether removal of the state engineer was an abuse of discretion;

(3) whether the district court's decision is consistent with this court's decision in *Big Horn I* regarding administration;

(4) whether the Tribes may administer state water rights on the reservation in light of recent United States Supreme Court decisions.

### A. *Removal of the State Engineer; Abuse of Discretion*

The duties of the state engineer are prescribed by the Wyoming Constitution, which states in part:

There shall be a state engineer who shall be appointed by the governor * * *. He shall be president of the board of control, and shall have general supervision of the *waters of the state* * * *.

Wyo. Const. art. 8, § 5 (emphasis added).

The general supervisory powers granted the state engineer under Wyo. Const. art. 8, § 5, were not intended to give unlimited and uncontrolled authority. *State By and Through Christopulos v. Husky Oil,* 575 P.2d 262, 264 n. 6 (Wyo.1978).

Justice Macy argues that to allow the Tribal Water Resources Agency to administer water useage on the reservation violates the Wyoming Constitution:

The water of all natural streams, springs, lakes or other collections of still water, *within the boundaries of the state,* are hereby declared to be the property of the state.

Wyo. Const. art. 8, § 1 (emphasis added). However, in *Big Horn I,* this court stated:

The decree does not violate state law. *The provision in the Amended Judgment and Decree does not purport to give full ownership of the reserved water to the State.*

*Big Horn I,* 753 P.2d at 114 (emphasis added).

Justice Macy cites the following sentence, providing his own emphasis, to lend support to his argument for restriction of the Tribes' reserved water right in *Big Horn I:*

---

**4.** *Brown v. Bd. of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

The government may reserve water from appropriation *under state law for use on the lands set aside for an Indian reservation.*

*Big Horn I*, 753 P.2d at 94 (emphasis added by Justice Macy). The *Big Horn* court, however, provided no such emphasis in this cite which was originally taken from *Winters*. The *Winters'* Court specifically stated:

> The power of the Government to reserve the waters and exempt them from appropriation under the state laws is not denied, and could not be.

*Winters*, 207 U.S. at 577, 28 S.Ct. at 212, 52 L.Ed. at 346–47 (citing *United States v. Rio Grande Ditch & Irrigation Co.*, 174 U.S. 690, 702, 19 S.Ct. 770, 774, 43 L.Ed. 1136, 1141 (1899); *United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905)). Justice Macy chooses not only to conveniently ignore the clear intent of the United States Supreme Court in *Winters* from which these words are taken, but to portend an interpretation from *Big Horn I* that is clearly in error and *did not exist.*

I reject the argument that the reserved water is the property of the state and the state engineer thus must have control. The reserved water rights of the Tribes are not within the boundaries of the state but are within the boundaries of the *reservation.* The characteristics and nature of Indian reserved water rights are different from state water rights. The determination of the priority date of Indian reserved water is not based on actual use by the Indians. *Montana ex rel. Greely v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 219 Mont. 76, 712 P.2d 754, 767 (1985). Nor can these rights be abandoned for non-use. *Id.*, 712 P.2d at 768. The right to reserved water by the Tribes vested at the time of creation of the reservation and title to the right is held in trust by the federal government for the benefit of the Indians. Joseph R. Membrino, *Indian Reserved Water Rights, Federalism and the Trust Responsibility*, 27 Land & Water L.Rev. 1, 2 (1992). Indian ownership of the reserved water rights is supported by the Wyoming Constitution:

**Ownership of certain lands disclaimed; restriction on taxation of nonresidents.** The people inhabitating this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and *to all lands laying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States*, the same shall be and remain subject to the disposition of the United States *and that said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States * * *.*

Wyo. Const. art. 21, § 26 (emphasis added).

These Indian reserved waters are not state property. The state does not claim ownership of the federal reserved waters of Yellowstone which lay within the boundaries of Wyoming, nor can it assert such ownership to the reserved waters of the reservation. Despite Justice Macy's assertion, this claim is not supported by the Wyoming Constitution:

> Water being essential to industrial prosperity, of limited amount, and easy of diversion from its natural channels, its control must be in the state, which, *in providing for its use*, shall equally guard all the various interests involved.

Wyo. Const. art. 1, § 31 (emphasis added).

This section was intended to confer control over those waters in which the state has a role in "providing for its use." The state does not provide for the use of reserved water rights on the reservation; thus, the application of this constitutional provision to the Indian reserved rights is inapposite.

In *Big Horn I*, we looked to the state engineer to provide "incidental monitoring" of Indian reserved water rights on the reservation and cautioned against reference to this conduct as constituting "administration." *Big Horn I*, 753 P.2d at 115. The clear intent of *Big Horn I* was to permit the state engineer to *monitor* the use of water on the reservation, not to *administer* state law to the use of reserved rights

by the Indians. *Big Horn I*, at 115. We stated:

> The decree entered in the instant case does not require application of state water law to the Indian reservation. The decree recognizes reserved water rights based on federal law. *The role of the state engineer is thus not to apply state law, but to enforce the reserved rights as decreed under principles of federal law.*

*Big Horn I*, 753 P.2d at 115 (emphasis added).

It is unequivocal from this earlier discussion that the state engineer is not to act in his constitutionally appointed role as the "state engineer" but to provide monitoring or oversight of the reserved rights awarded by decree. We stated that

> *an independent water master might properly be appointed at this time to administer the decree and in light of the state engineer's limited authority.* The Treaty of 1868 prohibits only unauthorized persons from entering the reservation, but *the state engineer would be an authorized person upon his appointment to monitor the decree* and could properly enter the reservation.

*Big Horn I*, 753 P.2d at 115 (emphasis added).

The district court appointed the state engineer as an officer of the court to act, in essence, as a "water master" to monitor the reserved rights decree. "The prerogative of the district court to appoint a master is not only established in general law, but is expressly provided by W.R.C.P. 53." *Palm v. Palm*, 784 P.2d 1365, 1369 (Wyo. 1989) A "master" by definition is "a person very skilled and able in some work, profession, science, etc; expert." A "master" in the legal context becomes "any of several court officers appointed to assist the judge by hearing evidence, reporting on certain matters, etc." *Webster's New World Dictionary* 873 (2d College ed. 1978).

As water master of the water rights on the reservation, the state engineer is to monitor the reserved rights and "contemplate neither the application of state law

nor the authority to deprive the Tribes of water without the assistance of the courts in a suit for the administration of the decree." *Big Horn I*, 753 P.2d at 115. The state's response to the Tribes' Motion For Order to Show Cause Why Further Relief Should Not Be Granted attached an affidavit of the state engineer which concluded that the Tribes' instream flow permit could not be recognized for failure of the Tribes to request approval of the state engineer for a change of use. Report and Recommendation of the Special Master, October 4, 1990, at 3. The special master noted in his Conclusions of Law, as did the district court in its Findings of Fact, that the role of the state engineer was to enforce the Tribes' reserved water rights under principles of federal law. *Id.* at 20; Judge Hartman, Judgment and Decree at 15 (March 11, 1991). Though finding that the state engineer's acts were not contemptuous, the district court's act authorizing the Tribes to administer the water rights on the reservation effectively removed the state engineer from those duties. Judge Hartman, Judgement and Decree at 17 (March 11, 1991).

The district court's decision to replace the state engineer in his role as water master with the Tribal Water Resources Agency removed him not from his constitutionally protected duties to apply state law as a state engineer, but from his duties as a water master to monitor the decree. The broad discretion granted the district court to appoint a master under Wyo.R.Civ.P. 53 must confer discretion to remove the master if the law is not applied as decreed.

I would hold that the state engineer did not act as instructed by *Big Horn I* and that removal was appropriate exercise of the district court's discretion. I find it difficult to fathom how the state engineer could have sufficiently executed the role of impartial water master while acting as the state's chief negotiator in talks with the Tribes over water issues and at the same time retaining the constitutional duty to protect the waters of the state.

B. *Administration of Water Rights Under Big Horn I*

The district court granted the Tribal Water Resources Agency the authority to "*ad-*

*minister* all water rights within the stipulated boundaries of the reservation" specifying that non-Indian rights were to be administered "according to state water law by the Tribal agency, with appropriate judicial review in state district court pursuant to Title 41 of the Wyoming statutes." Judge Hartman, Judgement and Decree, March 11, 1991 (emphasis added). This decision implicates two distinct concerns: the issue of administration of water rights under *Big Horn I* and regulation of the water rights of non-Indians on the reservation in light of recent decisions in this area.

As mentioned above, in *Big Horn I* we were careful to distinguish "monitoring" of the decree from "administration." *Big Horn I*, 753 P.2d at 115. It is not merely a question of semantics to make this distinction. To "administer" is to manage or direct as opposed to "monitor," which means to watch or check on. *Webster's, supra,* at 18. It is no accident that this court meant to affirm only the lesser powers of *monitoring* to the state engineer in *Big Horn I*. That authority permitted the state engineer to enforce the reserved rights under federal law principles by turning to the court for enforcement against the Tribes if violations were noted. We said:

> The role of the state engineer is thus not to apply state law, but to enforce the reserved rights as decreed under principles of federal law. * * * Should the state engineer find that it is the Tribes who are violating the decree, it is clear that he must then turn to the courts for enforcement of the decree against the United States and the Tribes and that he cannot simply close the headgates.

*Big Horn I*, 753 P.2d at 115.

Under the decree, the Tribes were required to first seek protection against state water users from the state engineer before pursuing court assistance. We stated:

> The decree only requires the United States and the Tribes first to turn to the state engineer to exercise his authority over the state users to protect their reserved water rights before they seek

court assistance to enforce their rights; it does not preclude access to the courts. *Big Horn I*, 753 P.2d at 115.

In the instant case, the Tribes, following the guidelines of *Big Horn I*, requested that the state engineer enforce their federal reserved water rights by ensuring that their instream flow dedication was fulfilled. Report and Recommendation of the Special Master, October 4, 1990, at 2. The state engineer failed to apply federal reserved water right principles and insisted on applying state water law to the Tribes' request. As a result, the Tribes received no relief and no protection from the state engineer in his role as water master. Their relief came only after bringing suit in district court.

The reluctance of the state engineer to enforce the federal reserved water rights has placed an unnecessary burden on the Tribes. I see no reason to continue to insist that the Tribes request relief from the state engineer before pursuing a remedy in district court. The Tribes, in monitoring their reserved rights and all water rights on the reservation, must turn to the court for enforcement against violations by state water users and protection of their federal reserved rights.

C. *Monitoring Non–Indian Water Rights on the Reservation*

The very earliest case considering jurisdiction on Indian reservations recognized the rights of Indian tribes based on their inherent sovereign authority. *Worcester v. Georgia,* 31 U.S. 515, 6 Pet. 515, 8 L.Ed. 483 (1832). Subsequent cases have characterized this inherent sovereignty as so deeply engrained in our jurisprudence as to create a backdrop on which to hang the rights acquired by treaties and against which "vague or ambiguous federal enactments must always be measured." *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665, 672 (1980) (citing *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)). "Ambiguities in federal law have been construed generously in order to com-

port with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *White Mountain*, 448 U.S. at 144, 100 S.Ct. at 2578, 65 L.Ed.2d at 673.

The conflict over whether state law could be applied to activities on the reservation has evolved from the initial consideration of infringement on the right of Indians to govern themselves, *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), and progressed to include preemption by federal law by way of a comprehensive federal scheme that would be frustrated by state regulation. *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). "The tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been pre-empted by operation of federal law." *White Mountain*, 448 U.S. at 143, 100 S.Ct. at 2583, 65 L.Ed.2d at 672 (citing *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 475, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976)). "Tribal rights are abrogated only if Congress 'has clearly expressed its intent to do so,' keeping in mind that 'doubtful expressions of intent must be resolved in favor of the Indians.'" *State of S.D. v. Bourland*, 949 F.2d 984, 990 (8th Cir.1991) (quoting *Lower Brule Sioux Tribe v. South Dakota*, 711 F.2d 809, 827 (8th Cir. 1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984)).

In *White Mountain* the Court considered the barriers to assertion of state regulatory powers over an Indian tribe to include the *Williams v. Lee* infringement test, preemption analysis under *Warren* and whether the resultant regulation would burden the tribe. The Court recognized the firm federal policy of promoting tribal self-sufficiency and economic development, noting that no express congressional statement is needed to find a particular state law to have been preempted. *White Mountain*, 448 U.S. at 144, 100 S.Ct. at 2584, 65 L.Ed.2d at 673.

The district court has authorized the Tribal Water Resources Agency to administer *all* water rights on the reservation, including those of non-Indians holding land in fee with state water permits. "Administration" of water rights does not comport with this court's previous decision in *Big Horn I*. However, the question now becomes whether the Tribes may engage in the lesser regulatory activity of "monitoring" the use of water on the entire reservation. *Big Horn I* did not address the issue of tribal regulation or the regulation of non-Indian water rights on the reservation. We stated only that "[t]his court is also cognizant of the fact that exercise of the reserved water rights are [sic] intimately bound up with the state water rights of off-reservation users." *Big Horn I*, 753 P.2d at 115. It is obvious to any observer that exercise of reserved rights must also be intimately bound up with the state water rights of non-Indians on the reservation as well.

The Tribes are "unique aggregations possessing attributes of sovereignty over both their members and their territory" and as such have the authority to monitor reserved water rights on the reservation. *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706, 716 (1975). Recognizing this inherent authority, I turn now to the issue of Indians regulating use by non-Indians on the reservation.

In *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Supreme Court considered whether the Crow Tribe could regulate hunting and fishing by non-Indians on fee owned land within the reservation. The Court held that inherent tribal sovereignty was not in itself enough to support regulation in this instance and the exercise of tribal power beyond that necessary to protect tribal self-government or control internal affairs needed congressional delegation to survive. However, the Court also stated that

> a tribe may * * * retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the

political integrity, the economic security, or the health or welfare of the tribe. *Montana v. United States,* 450 U.S. at 565–66, 101 S.Ct. at 1258, 67 L.Ed.2d at 511.

In *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation,* 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989), the Court considered a conflict between the Yakima tribe and the county over which entity had the power to regulate zoning on two distinct types of lands within the reservation: areas closed to non-Indians and areas open to the general public. The open area included fee owned lands held by non-Indians as a result of the General Allotment Act of 1887. Though the Court discussed the tribe's power to exclude non-Indians from the reservation, it concluded that the Allotment Act took away the exclusive power to exclude those with fee title, leaving a lesser power to regulate. However, the Court was reluctant to find that the tribe had retained its inherent sovereignty in this area by refusing to employ the principles of *Montana,* without a showing by the tribe that the circumstances constituted a "demonstrably serious impact by the challenged uses that imperils tribal political integrity, economic security, or health and welfare."

Following *Brendale,* the Court considered tribal jurisdiction over a non-member criminal defendant and acknowledged that

> our decisions recognize broader retained tribal powers outside the criminal context. * * * As distinct from criminal prosecution, this civil authority typically involves situations arising from property ownership within the reservation or "consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana v. United States,* [450 U.S.] at 565 [101 S.Ct. at 1258] * * * The exercise of criminal jurisdiction subjects a person not only to the adjudicatory power of the tribunal, but also to the prosecuting power of the tribe, and involves a far more direct intrusion on personal liberties.

*Duro v. Reina,* 495 U.S. 676, 688, 110 S.Ct. 2053, 2061, 109 L.Ed.2d 693, 705 (1990).

I would hold, as the court did in *Colville Confederated Tribes,* that regulation of water on the reservation is critical to the lifestyle of its residents and development of its resources. "The cultural vitality of tribes is tied to the application of tribal values to guide the use of reservation resources." David H. Getches, *Management and Marketing of Indian Water: From Conflict to Pragmatism,* 58 Colo.L.Rev. 515, 527 (1988). Water regulation is an important sovereign power. *Colville,* 647 F.2d at 52. It is hard to imagine a resource more critical to the economic security or health and welfare of the Wind River Reservation Tribes.

In light of the unwillingness of the state engineer to date to protect these important reserved right interests of the Tribes, it is imperative that the Tribes have the authority to do so. By avoiding multiple jurisdiction of water rights on the reservation, I would hope to avert needless duplication, expense and continued conflict. Getches, *supra,* at 530.

I would hold "monitoring" to be a lesser intrusive oversight and not as restrictive or controlling as the regulation of water rights proposed by the tribe in *United States v. Anderson,* 736 F.2d 1358 (9th Cir.1984) or the zoning regulations in *Brendale.* (The *Anderson* court limited the state's regulatory authority over non-Indian fee owners to the use of *excess* water.) Competing interests between the state and Tribes over this limited grant of control need not be weighed. Safeguards are in place to ensure that the result of tribal monitoring of non-Indian water rights will not subject non-Indians to the jurisdiction of the Tribal Water Resources Agency but will be referred to district court for resolution.

## A GUIDE TO THE COURT'S PRESENT OPINION

If one looks closely at the fragmented opinions of my four brethren, it is not unlikely that bewilderment will ensue. It is unfortunate that clarity of vision and

voice have eluded the court in this most important opinion. The Tribes' application of future waters to instream flow is denied, though no clear majority opinion exists to determine why. Justices Macy and Thomas conclude that state law precludes this dedication, and Justice Cardine views the Treaty as preventing it, though also concluding that state law does not govern its use.

At least three Justices (Macy, Thomas and Brown) conclude that the state engineer should regulate the water on the entire reservation, but the law that should be applied is federal, not state law, according to Justices Cardine, Golden, and Brown.

The result of the court is fragmented, providing no clear guidance to the parties. Pragmatically, it is difficult to imagine how this opinion can be implemented. The court has stated that two different types of law apply to two inter-related issues. A coherent opinion would have at least determined a consistent answer to the question of what law applies to Indian water rights on the reservation. All that is really clear from this narrow opinion is that the parties will continue to litigate their conflicts.

I submit the following outline as a road map to the court's splintered offering to demonstrate point by point the position of each justice and to illustrate the confused interpretations and misapplication of prior precedent in this case:

## I. INSTREAM FLOW

A. *Scope of Discussion*
1. Limits discussion to future project waters—Justice Macy; Justice Thomas generally agrees
2. Distinguishes between future project waters which have never been applied to irrigation and waters historically applied to irrigation—Justice Cardine
3. Discusses both future and historic waters or does not distinguish between them—Justices Golden and Brown

B. *Interpretation of Big Horn I*
1. *Big Horn I* gave right to use water only for agricultural purposes, not for an instream flow—Justice Macy; Justice Thomas generally agrees
2. Sees real issue now as sovereignty though this was not addressed in *Big Horn I*—Justice Thomas
3. *Big Horn I* never discussed change of use or other uses—Justices Golden and Brown

C. *What Law Applies to Change of Use*
1. Tribes must seek change of use for future project waters under state law—Justices Macy and Thomas
2. Change of use is not subject to state law; Federal or Tribal law applies; but also states that federal policy of deference to state water law must be respected—Justice Cardine
3. State law does not apply to change of use and not supported by *Big Horn I;* federal law applies; following *Big Horn I,* state acknowledged various water uses permitted by Tribes and should now be estopped from changing its position—Justices Golden and Brown

D. *Diversion*
1. Diversion not necessary—Justice Macy; Justice Thomas generally agrees; Justices Golden and Brown also agree
2. Future water must first be applied to land before change of use allowed under federal or tribal law—Justice Cardine

E. *Beneficial Use*
1. Beneficial use is key and is seen as an evolving concept—Justice Macy; Justice Thomas generally agrees
2. Future "paper right" must be applied to beneficial use before allowed to interfere with state appropriators and beneficial use is defined only as irrigation; *but* determines that beneficial use should be broadly applied to the federal reserved right and therefore allow for instream flow development; disagrees with Justice Macy that "change of use must be hamstrung by compliance with Wyoming statutes defining acceptable uses"; states that when Indian rights are not in use they may be taken by junior appropriators—Justice Cardine

3. Earlier district court decisions in this case by Judges Joffe and Johnson held that Tribes may use water in any manner they deem advisable or to their benefit; this was not reversed by *Big Horn I* and is now the law of the case;—Justices Golden and Brown

F. *Inconsistencies in opinions*

*Justice Thomas*—Though he states that instream flow must be accomplished under state law, he intimates that an instream flow right may not be foreclosed to the Tribes. This seems inconsistent with Justice Macy's opinion with which he generally agrees. Justice Macy states that only the state of Wyoming shall own an instream flow right; consequently, the Tribes would not be able to have a dedication even if they went through the state application process.

*Justice Cardine*—Reads Justice Macy's opinion as precluding dedication of existing irrigation rights to instream flow by virtue of the application of Wyo.Stat. § 41–3–1002(e) (1977), though Justice Macy explicitly states that that discussion is left for another day.

Justice Cardine defines beneficial use in this context as only meaning irrigation and goes so far as to intimate that instream flow may be wasting water. He takes issue with Justice Macy's conclusion that Wyoming statutes must define acceptable (beneficial) uses and procedures for change of use and states that beneficial use concept must be more broadly construed when applied to federal reserved water rights. However, he creates a condition on any change of use of future rights by concluding they must first be diverted, which is more restrictive than state law and has no support under federal reserved rights law. Justice Macy notes that beneficial use does not require a diversion but is an evolving concept that can be expanded to "reflect changes in society's recognition of the value of new uses of our resources." Though Justice Cardine states that change of use is not subject to state law, he also contends that federal deference to state law must be respected, contrary

to *Colville Confederated Tribes v. Walton,* recognizing that congress did not intend for the states to have this power on federal reservations.

Justice Cardine's opinion is apparently based on what he feels ought to be done at this time and advocates the "sensitivity doctrine," which was rejected in *Big Horn I*, believing it unfair to appropriators to stand by and watch the Tribes "waste" water. He notes that Indian rights not in use may be taken by others with junior rights. The authority cited for this proposition is taken from a treatise published in 1977. However, absent any authority by the authors themselves, this premise appears to be conjecture or speculation.

## II. ADMINISTRATION OF WATER RIGHTS

A. *Who Owns the Water*

1. All water within the boundaries of the state belongs to the state—Justice Macy

2. Indian reserved water rights are merely property rights; concedes that Tribes have sovereignty over the diminished portion of the reservation, but unclear whether this also means ownership of the water—Justice Thomas

3. Indian reserved water right is not state water—Justices Cardine, Golden and Brown

B. *Who Should Manage Water Rights*

1. State engineer should administer all water rights on the reservation, turning to the courts for enforcement authority—Justices Macy and Brown; Justice Thomas generally agrees

2. Joint administration between the state and the Tribes, turning to the courts for resolution of disputes—Justice Cardine

3. Tribes should monitor both Tribal rights and non-Indian rights on the reservation, turning to the courts for resolution of disputes—Justice Golden

### C. Why They Should Manage

1. State engineer has constitutional mandate to administer the waters of the state; removal by district court is violation of separation of powers and state engineer's constitutional duty—Justice Macy; Justice Thomas generally agrees

2. Right of state engineer to regulate water rights is vested as the law of the case—Justice Thomas

3. Joint administration seen as way to adopt new spirit of cooperation between the parties—Justice Cardine

4. Dual administration would create more problems than it would solve—Justice Brown

5. State engineer, in his role as water master under *Big Horn I,* did not protect Indian reserved rights; removal by district court was not removal in his constitutional capacity as state engineer but as water master—Justice Golden

### D. Level of Management

1. Discusses "administration" by state engineer and then cites "monitoring" language from *Big Horn I* and concludes that current opinion is consistent with *Big Horn I*—Justice Macy; Justice Thomas generally agrees

2. Discusses in terms of regulation and management—Justice Thomas

3. Discusses joint administration—Justice Cardine

4. Discusses in terms of management—Justice Brown

5. Specifically distinguishes between administration and monitoring; Tribes should monitor water rights in similar fashion as the right to monitor given to the state engineer in *Big Horn I*—Justice Golden

### E. What Law Applies

1. Relies on the application of state law to determine the instream flow issue and concludes the present decision is consistent with the duties and limitations imposed in *Big Horn I,* though *Big Horn I* did not authorize application of state law—Justice Macy

2. Reserved water right is property right subject to state regulation—Justice Thomas

3. Federal law applies—Justices Cardine, Golden and Brown

### F. What Should Be Administered

1. Entire reservation by state engineer—Justices Macy and Brown

2. Distinguishes between ceded and diminished portions of reservation; state engineer must regulate on ceded portion as it was disestablished as reservation; pragmatic to have state engineer regulate on diminished portion as well, though he recognizes Tribal sovereignty on diminished portion—Justice Thomas

3. Entire reservation through joint administration—Justice Cardine

4. Distinguishes between Indian and non-Indian water rights on the reservation but concludes that monitoring is a lesser infringement than administration and should be conducted by the Tribes on the entire reservation—Justice Golden

### G. Inconsistencies in opinions

*Justice Macy*—Discusses the opinion in terms of "administration" but concludes that present opinion is consistent with *Big Horn I;* discusses instream flow in terms of state law application but concludes that current decision on administration is consistent with the duties and limitations imposed by *Big Horn I* which did not recognize application of state law to monitoring by the State Engineer.

*Justice Thomas*—Concedes that Tribal sovereignty exists over the diminished portion of the reservation, but concludes that pragmatic solution is for state engineer to regulate over this area, too.

### CONCLUSION

If one may mark the turn of the 20th century by the massive expropriation of Indian lands, then the turn of the 21st century is the era when the Indian tribes

risk the same fate for their water resources.

Membrino, *supra,* at 14.

Today some members of the court sound a warning to the Tribes that they are determined to complete the agenda initiated over one hundred years ago and are willing to pervert prior decisions to advance that aim. I cannot be a party to deliberate and transparent efforts to eliminate the political and economic base of the Indian peoples under the distorted guise of state water law superiority.